Curia, per
Richardson, J.
The relator, James Adger, resides on Charleston Neck, which is without the city of Charleston. But he carries on the profession and busines of a Cotton Factor and Commission Merchant, within the city. It may be observed, that this is a general profession, in no way dependent'on the municipal ordinances of the city of Charleston. The relator complains, that his carriage, which he uses for his personal convenience, both within and without the city, has been taxed twenty-five dollars, and his carriage horses, at five dollars each. These are the taxes laid upon such carriages and horses, when owned and used by the inhabitants of the city.
He complains, further, that his carriage driver, Pompey, is taxed at seven dollars, and his slave, Thomas, who works in the city, in virtue of a city badge, also at seven dollars; which tax, on Pompey and Thomas, is four dol *728 lars more than the general tax laid on similar property of the inhabitants of the city, ($2 50.)
The further complaint, that the relator has been obliged to pay for Thomas’s badge, double the price required of the inhabitants, we need not notice. Because such double price did not constitute an assesment upon his property, but was voluntarily paid by him. That complaint does, therefore, afford no ground for relief, at least by the writ of prohibition.
The questions are, then, confined to the powers of the Mayor and Aldermen, to lay any tax upon the carriage, horses, and driver of the relator, residing out of the corporate limits of Charleston, or to lay any tax upon the slave, Thomas, although working in the- city, under a badge, purchased of the city authorities, and required by their municipal and police regulations; i. e. Does such voluntary placing Thomas under a city badge, render him “taxable property” within the city: and if so, to what extent of taxes %
This general question is first to be considered. Can the Mayor and Aldermen lay a tax upon the carriage, horses or driver of a non-resident of the city, because he uses them while carrying on his business in the city; or carrying him to and from his place and office of business, dsc? There is no complaint of the tax upon his income, as Factor and Commission Merchant. Such a tax is justified by the Act of 1836, 7 Stat. p. 147. The complaint is of that, which may be called the derivative tax, as being connected with that assessed upon his business done in the city. The general power conferred on the city authorities, to assess property by taxes, is given by the Act of 1783, 6 Stat. p. 97, to incorporate Charleston, in these words, &c. “And the said city council shall also be vested with full power and authority to make such assessment on the inhabitants of Charleston, or those who hold taxable property within the same, for the safety, convenience, benefit and advantage of the said city, as shall appear to them expedient.” 7 Stat. 98.
The questions upon this enactment are, what are the chartered legislative powers of the city council, now Mayor and Aldermen, first, in laying taxes on the “taxa *729 ble property” within the limits of Charleston, but belonging to persons residing out of the city1? Secondly, what is their right of taxing such non-residents, who yet carry on a general business, trade or profession within the city 1
This second question arises more properly under the recent Act of 1836, as will be seen ; but it was made under both Acts, i. e. the charter of 1783, and the Act of 1836. And, of course, both Acts are for judicial construction.
We consider the charter first. The leading rule and principle of law, for the construction of such Acts of incorporation, is well established. Corporations are creatures of their charter. 1 Bac. 3; 2 Kent, 240 ; Kyd & Black, &c. &c. The powers vested in a corporate body or chartered association of men, are for a public purpose, and consist, not in a restriction of powers before vested, but in a delegation of neic and particular powers, which cannot be extended beyond the letter of the Act of incorporation, unless the implication of some power beyond the letter be unavoidable, and necessarily follow the powers expressly given. And then the obvious aim and sense of the law, cannot but be the very law; and we have the true construction in allowing such implied power.
In the instance of the charter of Charleston in 1783, the power to assess the inhabitants is general, and is placed, by the letter of the charter, at discretion; so it be done “ for the safety, benefit, convenience, and advantage of the city.” But the tax on those who hold taxable property within the same, is as evidently confined to a tax restricted to the assessment on such “táxable property.” So far, I can perceive no room for mere construction. The terms are plain. The tax is to be paid by the owner, of course. But to be assessed, i. e. measured, or rateably apportioned to his taxable property “within the city.” And the rule already laid down, forbids the extension of any tax by the construction of the charter, to be assessed upon his head, or poll, or upon his taxable property held elsewhere. Because the power is confined by the charter to taxable property ■‘ within the city.” And we find no premises for the induction of any derivative or other tax upon such non-residents of the city. This conclution appears mani^ *730 fest, then, both from reason and from the letter of the city charter of 1783. Bat it is by the Act of 1836, 7 Stat. 147, that the city council, now properly called the Mayor and Aldermen, is supposed, with more confidence, to be vested with the power to tax the carriage, horses, and slaves of the relator, because he carries on his business within the city. This recent Act i£ as follows, (fee. “The city council, (fee. shall be,” (fee. “vested with power, (fee. to levy and collect such assessments and taxes, on the income and profits of persons resident without the limits of the city of Charleston, derived from the pursuit of any faculty, profession or occupation conducted within the limits of the said city, as the said city council shall deem expedient, for the safety, convenience, benefit and advantage of the said city.” “Provided, that no tax imposed upon the said persons, so resident without the said city, shall be at a greater rate than that laid upon persons resident within the same.”
The delegation of the taxing power here given, is also manifestly limited. The income and profit of the faculty, profession or occupation, so carried on within the city, are to be taxed. The income is taxed, not the capital or means of his profession. Now, then, are the relator’s carriage, horses and driver, or any other means by which he is personally served and helped in carrying on his business and profession, in any way connected with the idea of income and profits'? If so, then outlay, expenditure of income, or money spent, constitute income and profits.
This cannot be reconciled to the meaning of income, any more than the rent the relator necessarily pays for his office or store-house, or the salary to his clerk, or for any other means essential or incident to his business. All these are the expenditures of his profession, and constitute the opposites and antagonists of income and profits. Income and profits are the nett gains or revenue, after all deductions for necessary expenditures. But there is no necessity for pressing the argument to extremes. It is enough to say, that the city council, under this last Act, cannot first tax the income of the employment, and then tax the capital or its details, by taxing the instruments, means and *731 helps by which the income has been realized and rendered a taxable thing. In a word, if I may so express the meaning of a tax upon income and profits, the tax is upon the fruit, not upon the roots, trunk or branches of the tree that bears the fruit. It might have been allowed upon each, but the tax is allowed on the fruit alone. Under those two Acts, therefore, the taxing power of the Mayor and Aldermen is confined, 1st. To the inhabitants of "the city at discretion. 2d. To the taxable property within the city, of nonresidents; and 3d. To the income of nonresidents, from professions carried on within the city. Under, therefore, either the charter of 1783, or the Act of 1836, the taxes laid on the relator’s carriage, horses and slave, Pompey, are clearly beyond the taxing power given to the city council, now called the Mayor and Aldermen. And there is no other Act giving them power to assess taxes, that can relate to the question before the court. The tax on sales at auction, and some others, might be noted, but none have been on the present questions.
We come now to the tax on the slave, Thomas, who works in the city, under a city badge, voluntarily purchased of the city authorities by Mr. Adger, in order to bring him within the police regulations of slaves within the city. At the first blush, Thomas would appear, like Pompey, to follow and to be located at the residence and domicil of his owner; and, therefore, not within the meaning of taxable property “within the city.”
It is true, that such is the general rule for goods and chattels, and all personal property; they are appendant and appurtenant to the owner’s person, and their legal residence and home, if I may so express a principle of law, is at his settled residence or domicil. Just as a husband, who, however he wander abroad, still has his legal domicil, as the general rule, at the place where he has settled his wife and family. See 4th and 9th chap, of Story’s Com. where the cases are collected from many adjudications and various nations; and all agree in this principle of the domicil of the master or owner drawing to one spot, as for a legal residence, and to the laws of that place, all his moveable property.
This principle is, in fact, at the very foundation of my *732 reasoning upon the place where the carriage, horses and driver of Mr. Adger belonged; and why they Were not taxable by the city authorities, i. e. because', wherever they might be used by the relator, for himself, his family or friends, they were still, on legal principles, attached to his person and located at his domicil. But as a husband might fix his domicil apart from his wife and family, by his own act and will, so might the relator have placed his carriage, horses and driver, as a licensed hackney coach within the city. And in that case, I apprehend, they might be taxed like other property of the like kind within the city, belonging to a nonresident, so it be not more than the tax laid upon the hackney coaches of the actual inhabitants of the city. But there Would be no discrimination by an increased tax on the nonresident. Because to assess taxes, is to lay on equal burthens as the price of protection. I consider, therefore, the proviso of the Act of 1836, to be the recognition of a general rule in taxing, and never to be dispensed with, by, at least, any inferior body or delegated authority; unless under their express chartered powers to tax in that manner. The principles of justice sufficiently point out the necessity of equal taxation. But for authority* see Art. 1. sec. 1. Con. of U. S. and 2 Kent, 268 * and the principles of Political Economy, by Adam Smith. To discriminate, then, by an increased tax upon a nonresident citizen, who happened to hold taxable property, or to carry on a general profession, within the city, or to tax him at all, except upon such particular property or profession, would amount to the assumption of a new, substantive and great power of assessing taxes, and so capable of a dangerous abuse, if allowed, as to justify the stricture made by the counsel for the relator — that it would enable the city to pay its debts by the contributions of nonresidents, in the form of taxes. Such persons are absentees only, from their own domicils or stations. But it is enough to say, that it would be an induction of power by mere construction, the premises of which are not to be found in the Act of 1836, or in the charter of the city, or in their spirit or purpose. On the contrary, and it will furnish an instance of a power fairly inferrable from the express powers, to tax the carriage, if it were converted *733 into a licensed hackney coach plying for passengers within the city, seems a just, if not an irresistible inference of reason, from the power to tax property within the city, and the scope, object and purpose, of both the charter and the Act of 1836. Because this is an employment subject to the local police, and may, or may not, be licensed in the city. And every person may, if he dioses, place his carriage under such a police; and this voluntary submission of it to such local government, may well change its otherwise implied connection with his domicil, and place the moveable personal property within the city by a new connection. The rule of the domicil does not cross the will of the owner, but is supposed to follow. And he may give his personal property a new locality, which is often done. For instance, by annexing them to houses, mills, <fcc. usually called fixtures, &a. by changing his domicil, <fcc, and assuredly he may do the same by contract, express or implied, and for a consideration, as in the case supposed of the hackney coach, voluntarily placed under the city license. I admit that the distinction here taken, favors the taxing power of the city, by extending its application to the subjects and persons placed under its own municipal government, wherever they may be located. In fact, this is done by construction merely. But such a constructive consequence appears to follow irresistibly, and if it were otherwise, great inconvenience, if not frauds upon the municipality, might be practiced, in many cases embraced by this distinction in favor of the taxing power of the city. In fact, the very next case for our decision, turns upon it; and on that account, as well as for the present case, we would have the grounds of the distinction made plain. We would be guarded against the constructive powers of corporations, and especially of Legislative and taxing corporations. But their chartered authority is of their own legal right, never to be assailed by a government made for the protection of the vested and legal rights of men. Our courts would, therefore, be strict against their assumptions, yet considerate and just to their proper authority. But unless the premises from which the construction is made, be found in the Act of incorporation, the rule of construction would become the instrument of partiality or preju *734 dice; or our own habits of thinking or acting irrespective of the written charter, and we might there interpolate or arrest vested powers. The right understanding, therefore, of the only proper foundation of the rule of construction, is essential to its just application. And as the present decision has an immediate bearing upon many similar cases, I repeat briefly the premises of our construction.
First, the Mayor and Aldermen have express authority to assess all property within the city, whether of inhabitants, or of nonresidents. Secondly, they have also the express powers of the government and police regulations of the city. These powers are within the charter for the incorporation of Charleston. Thirdly, the relator has, in fact, placed his slave, Thomas, expressly under the police regulations of the city, by purchasing a badge to authorize him to ply for work within the city regulations.
From these premises, the constructive induction is made, that Thomas has been voluntarily made “taxable property within the city,” in the proper sense of those terms of the charter of 1783, notwithstanding the rule of the domicil and its general application to personal property. Little need be said upon the argument, that the discriminating and increased tax on the slaves of nonresidents might be placed under the regulating or police powers of the Mayor and Aldermen, and may be to guard against too great an influx of slaves. And evidently, the classing of negro laborers, by badges, belongs to that branch of power, and might be used for such a purpose. But this cannot change the principles or power of taxation. Taxes are for revenue ; and they must be equal and impartial between the city inhabitants and the nonresident citizens of the State, according to property within the city.
My notion, therefore, for an increased power of taxing nonresidents, or of taxing them double, deduced from the police and regulating franchise of the Mayor and Aider-men, or from the supposed absenteeism of nonresidents, is a forced induction, that has too little ground found in their chartered legislative rights, to be tenable. This principle was strongly, but no more than fairly, expressed, when one of the counsel said, “you cannot tax a man for not being a corporator.” As little need be said upon usages. *735 The charter of 1783 is too recent for usage to indicate a chartered power by long acquiescence. Immemorial usage is proof of a former chartered power. In fact, learning and cases on this head, were introduced to shew, rather what might be, than what actually existed in Charleston. Another manner of argument was urged from the legislative power to repeal the city laws. But this power relates chiefly to unwise or inconvenient ordinances, and does not take away the citizen’s right to resist ordinances unauthorized by the city charter. This properly belongs to the judicial department, upon complaint being made, as in the present instance.-
To come, then, to a conclusion, none of these latter views or arguments, can alter the construction of the taxing power of the Mayor and Aldermen, as first considered by the court and applied to the charter of 1783, and the. Act of 1836. The decision of the Circuit Court is, therefore, affirmed.
The writ of prohibition is to arrest the tax on the relator’s carriage, horses and carriage driver, and also the excess of the tax laid upon Thomas, over and above the general tax laid upon the slaves of the inhabitants of the city of Charleston, which excess is $4 50.
O’Neall, Butler and Wardlaw, JJ, concurred.